IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DENNIS MURPHY, as Personal
Representative of the Wrongful Death Estate
of ANTONIO GURULE JACOBS,

     Plaintiff,

vs.                                   No.: 21-CV-822

ESPERANZA SAIZ, in her individual capacity,
MICHELLE HERRERA, in her individual capacity,
and KIMBERLY CHAVEZ-BUIE, in her individual capacity.

     Defendants.

## **COMPLAINT FOR FEDERAL CIVIL RIGHTS VIOLATIONS**

Plaintiff Dennis Murphy, as Personal Representative of the Wrongful Death Estate of Antonio Gurule Jacobs, states the following causes of action against Defendants:

### **INTRODUCTION**

1.     Antonio Gurule Jacobs – 26 months old – died while in the legal custody of the Children, Youth and Families Department ("CYFD") in September 2018. Antonio died after CYFD, through the actions and inactions of Defendants, improperly and inexcusably returned him to his biological mother for a second trial home visit despite unmistakable warning signs that she could not provide a safe home for her young son. Antonio died after CYFD wrongly and unjustifiably placed him with his biological mother who CYFD never confirmed was drug-free. Antonio died after CYFD returned him to his biological mother whose house was in vile condition and which CYFD failed to investigate in order to assure that it was a safe and appropriate place for a child to live. Antonio was murdered by a man living with Antonio's biological mother who

1

Defendants Esperanza Saiz, Michelle Herrera, and Kimberly Chavez-Buie knew or should have known Antonio was being left alone with, and that the man had a history of child abuse charges, drug abuse and criminal conduct. Despite this known information, Defendants Esperanza Saiz, Michelle Herrera, and Kimberly Chavez-Buie never investigated to determine whether the man living with Antonio's biological mother could safely care for Antonio.

2.     Antonio died as a result of a series of inappropriate and improper actions and decisions by CYFD social workers (Defendant Esperanza Saiz) and CYFD supervisors (Defendants Michelle Herrera and Kimberly Chavez-Buie) that departed from clearly established professional practices and standards and which evidenced a pronounced lack of professional judgment. These included: (a) placing Antonio with his biological mother for a second trial home visit without taking adequate and necessary steps to assure his safety from known risks; (b) failing to evaluate and monitor this placement in a timely and adequate manner in order to assure the safety and well-being of this young child; and (c) failing to require CYFD employees to make timely and accurate entries into a child's case file to ensure the child's safety and best interest were being served.

3.     As a direct result of the shocking and unconscionable actions and decisions by CYFD social workers and CYFD supervisors responsible for Antonio's safety and well-being, Antonio was murdered while he was in the legal custody of CYFD.

4.     This action arises under the provisions of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.

## THE PARTIES

5.      Plaintiff Dennis Murphy was appointed by the First Judicial District Court of the State of New Mexico to serve as the Personal Representative of the Wrongful Death Estate of Antonio Gurule Jacobs.  Mr. Murphy resides in Santa Fe County, New Mexico.

6.      At all times material to this lawsuit, Defendant Esperanza Saiz was a resident of New Mexico and was employed as a Permanency Planning Worker for CYFD. She was responsible, in whole or in part, for the safety and well-being of Antonio Gurule Jacobs, including where he was placed throughout the time that he was in CYFD custody.

7.      At all times material to this lawsuit, Defendant Michelle Herrera was a resident of New Mexico and was employed as a Permanency Planning Supervisor by CYFD.  Defendant Herrera was responsible, in whole or in part, for ensuring that CYFD, through Defendant Saiz, was providing for the safety and well-being of Antonio Gurule Jacobs throughout the time that he was in CYFD custody.

8.      At all times material to this lawsuit, Defendant Kimberly Chavez-Buie was a resident of New Mexico and was employed as a County Office Manager by CYFD for Valencia County.  Defendant Chavez-Buie was responsible, in whole or in part, for the decision to place Antonio Gurule Jacobs back into the dangerous home of Barbara Gurule before ensuring that the specific risks to Antonio were addressed and mitigated. As County Office Manager, Defendant Chavez-Buie had authority over CYFD workers' and supervisors' decisions, including Defendants Saiz and Herrera, with respect to their placement, monitoring and investigative activities.

9.      As a supervisor, Defendant Chavez-Buie was responsible for the training, supervision, review and control of her subordinates in all phases of their duties to secure proper disposition of the children within their jurisdiction, including Antonio, and to guard against

unlawful infringement of the constitutional rights enjoyed by children in CYFD's legal custody, including the right not to be subjected to an unsafe environment in which they were vulnerable to physical and/or emotional neglect or abuse.

10.    Defendant Chavez-Buie had an independent duty and ultimate authority to ensure the safety of the children within CYFD jurisdiction, including Antonio, and to guard against unlawful infringement of the constitutional rights enjoyed by children in CYFD's legal custody.

11.    At all times material to this lawsuit, Defendants Saiz, Herrera and Chavez-Buie acted within the course and scope of their duties as public employees, were state actors, and acted under color of state law.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

13.    The Court has personal jurisdiction over Defendants.

14.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

*Methamphetamines and Its Impact on Parenting*

15.    Barbara Gurule was a long-time substance abuser, who, in particular, had abused methamphetamines for decades.

16.    Methamphetamine is a stimulant that affects the central nervous system to provide a high that lasts much longer than other stimulants, like cocaine, as the effects can last from six to eight hours.

17.    People who use methamphetamines tend to use excessively over time and develop a binge use behavior toward the drug.

4

18.    A methamphetamine binge can last from several days to a week without sleep and creates a sense of euphoria.

19.    After the binge, users will frequently crash and sleep for 12-18 hours during withdrawal. The withdrawal period can also be marked by depression, irritability, fatigue, impaired social functioning, aggression, and an intense craving for the drug which draws the user to repeat the cycle through another methamphetamine binge.

20.    The neurotoxicity of methamphetamine causes damage to the brain. Such brain damage includes damage to dopaminergic and serotonergic transmitter systems as well as localized damage to the brain, which causes deficits in specific cognitive functions.

21.    Persons who use methamphetamines are known to have decision-making deficits. The decision-making deficits are also predictive of subsequent relapses in recovering methamphetamine addicts.

22.    A significant concern with methamphetamine abuse is the potential for sudden and intense violence.

23.    Methamphetamine use by a parent can drastically impact the environment for a young child.

24.    A parent who uses methamphetamine is more likely not to clean the home or maintain a clean home for a young child.

25.    A parent who uses methamphetamine is more likely not to purchase food for a young child.

26.    A parent who uses methamphetamine is more likely not to exercise good judgment on persons they allow into the home.

27.    A parent who uses methamphetamine is more likely to leave their child with inappropriate caregivers so that they can get high.

28.    A parent who uses methamphetamine is more likely to leave their drugs accessible to their child.

29.    A parent who uses methamphetamine puts the needs of their child second to their own need to use methamphetamine.

30.    Physical abuse of a child is likely when the child's parents are using methamphetamine.

31.    Physical neglect of a child is likely when the child's parents are using methamphetamine.

32.    Parents and caregivers on methamphetamine are often unavailable to children physically, psychologically, and emotionally.

### Barbara Gurule

33.    Barbara Gurule had six biological children with multiple different fathers.  For each of these children, Barbara Gurule either relinquished her parental rights or her parental rights were terminated.

34.    Barbara Gurule had a long history with CYFD and, as a result, CYFD had an extensive file on her that dated back to at least 1997.

35.    The previous circumstances in which CYFD had been involved with Barbara Gurule's children surrounded her methamphetamine addiction and the adverse impact it had upon her ability to safely parent.

### Antonio Gurule Jacobs

36.    Antonio Gurule Jacobs (Antonio) was born to Barbara Gurule on June 27, 2016.

37.     Ronald Bierend was the biological father to Antonio. At the time of Antonio's birth, Mr. Bierend was incarcerated for criminal sexual penetration of a child in the fourth degree and sexual exploitation of a child and thus was unable to parent Antonio.

38.     Less than three months later, on September 8, 2016, CYFD removed Antonio from Barbara Gurule as a result of neglect, in particular the disgusting and putrid conditions of the home. Law enforcement described the home as "not livable".

39.     At the time CYFD removed Antonio from Barbara Gurule's home in 2016, she was abusing methamphetamine and was not able to provide a safe environment for her young son.

40.     At the time CYFD removed Antonio from Barbara's home in 2016, CYFD also was concerned with the other people Barbara Gurule was allowing into her home and who had access to Antonio.

41.     In September 2016, Antonio was removed from his biological parents and placed in the legal and physical custody of CYFD.  CYFD placed Antonio into a foster home on September 8, 2016.

42.     CYFD identified the following safety threats for Antonio at the time of the removal: (a) Barbara Gurule's abuse and neglect history regarding other children; (b) the condition of the household; (c) Barbara Gurule's methamphetamine addiction and history; (d) Barbara Gurule's recent positive drug test; and (e) mental/physical illness of Barbara Gurule.

43.     CYFD substantiated the September, 2016 allegations and concluded that Barbara Gurule neglected Antonio by providing him with inadequate shelter and food as a result of her drug abuse.

44.     Upon taking Antonio into CYFD's legal and physical custody, the CYFD investigator (Elizabeth Strom) put together an Initial Assessment which identified the risks and harms posed to Antonio and put in place a plan to address those risks and harms.

45.     The September, 2016 Initial Assessment for Antonio's case required that Barbara Gurule complete the following:

      a.     A psycho-social assessment and follow through on recommendations;

      b.     A neuropsychological assessment and follow through with recommendations;

      c.     A substance abuse assessment and follow through with recommendations;

      d.     Random drug testing/breathalyzers as scheduled by CYFD;

      e.     A parenting assessment;

      f.     Visits with Antonio;

      g.     Identification of relatives for possible placement;

      h.     Signing all needed releases of information; and

      i.     A mental health assessment and participate in therapy if recommended.

46.     Defendant Saiz was assigned as the CYFD Permanency Planning Worker responsible for working with Barbara Gurule and Antonio.

47.     As the Permanency Planning Worker, Defendant Saiz was responsible for ensuring Antonio's safety, permanency and well-being while he was in the state's custody.

48.     Defendant Saiz also was responsible for identifying the dangers and risks that led to Antonio being removed from Barbara Gurule's custody. Her job was to follow the plan put in place to try to address and remove those dangers so that Antonio could be reunited with his biological mother, if that was possible to do in a manner that would assure Antonio's safety.

49.     Defendant Herrera, as Defendant Saiz's direct supervisor, was also responsible for identifying the safety threats to Antonio as a child in CYFD's legal custody.

50.     Defendants Saiz and Herrera were responsible for the continued assessment of Antonio until the abuse and neglect case was closed.

51.     Defendant Saiz was responsible for implementing the plan set forth in the Initial Assessment.

52.     Defendants Saiz and Herrera understood that if the identified safety threats were not addressed, Antonio would not be safe with Barbara Gurule and that he should not be returned to her care.

53.     Defendant Saiz, with the review and approval of Defendant Herrera, also was responsible for reporting to the Court on the progress and outcomes of Barbara Gurule towards addressing the safety risks for why Antonio came into CYFD's custody.

54.     Defendant Chavez-Buie was the County Office Manager and exercised supervisory authority over Defendants Saiz and Herrera.

55.     The Court in the abuse and neglect case relied upon, and imposed orders consistent with, Defendant Saiz's reports regarding the treatment plan and requirements for Barbara Gurule.

56.     One such court-ordered requirement for Barbara Gurule in the abuse and neglect case was that Barbara Gurule had to undergo random urinalysis drug screening as a result of the significant concerns regarding her drug abuse history and the way in which that history impacted her ability to safely parent Antonio.

57.     Defendant Saiz was responsible for setting up the urinalysis drug screenings for Barbara Gurule and for identifying whether she was complying with this mandatory term of the court-ordered treatment plan.

58.    Defendant Saiz was responsible for documenting all of Barbara Gurule's urinalysis drug screenings and results because it was important for Defendant Saiz to ensure Barbara Gurule was addressing the concerns about continued drug use and the safety threats it posed to Antonio.

59.    On January 10, 2017, four months after Antonio came into CYFD custody and the initial plan was put in place, Defendant Herrera met with Defendant Saiz.  At that time, Defendants Herrera and Saiz were aware of, and discussed, the following:

  a.    Barbara Gurule had not called in for, and had not submitted, any urinalysis samples for her drug tests;

  b.    Barbara Gurule had not shown up for her last six appointments for mental health and substance abuse counseling;

  c.    Although Barbara Gurule was attending supervised visits with Antonio, she was initially inconsistent with her attendance and when she did attend, she often would fall asleep during the visit rather that interact with her son.

60.    On February 10, 2017, Defendant Saiz knew that Barbara Gurule had not done any of the required urinalysis drug screenings since the time Antonio came into CYFD custody six months earlier.

61.    Defendant Saiz relied entirely on urinalysis drug screenings to monitor Barbara Grurule's drug use because she did not have the education or training in how to identify whether Barbara Gurule was using drugs.

62.    On February 20, 2017, Barbara Gurule was charged with shoplifting and criminal trespass.

63.    Shoplifting and criminal trespass are frequently committed by people addicted to and using drugs.

10

64.    On April 12, 2017, Defendant Saiz knew that Barbara Gurule had not done any of the required urinalysis drug screenings since the time Antonio came into custody eight months earlier.

65.    On May 9, 2017, Barbara Gurule informed Defendant Saiz she would start her urinalysis drug screenings the next day.

66.    On May 17, 2017, during a supervised visit with Antonio, Barbara Gurule reported that she relapsed and used drugs one week earlier. Defendant Saiz was made aware of Barbara Gurule's reported relapse.

67.    On June 12, 2017, Barbara Gurule reported to Defendant Saiz that she was getting urinalysis drug screenings through probation every two weeks, but Defendant Saiz never verified whether Barbara Gurule actually had submitted to any drug screenings through probation.

68.    At some point, Defendants Saiz and Herrera decided it was unnecessary to require the urinalysis drug screenings through the abuse and neglect case, and they chose to rely only upon probation to conduct the drug tests and monitor the results.

69.    Between May 2017 and February 2018, Defendant Saiz solely relied upon Barbara Gurule's assertions that she was doing urinalysis drug screenings through the terms of her probation.

70.    Defendant Saiz and Defendant Herrera never independently contacted the person alleged to be Barbara Gurule's probation officer at this time to confirm (a) that random drug screenings were ordered as a condition of her probation; (b) that Barbara Gurule actually was showing up for the random drug screenings; and (c) the results of her random drug screens.

71.     On August 14, 2017, Barbara Gurule identified Jeffrey Moody to Defendant Saiz as a person who was a part of her support system and who she would utilize in case of an emergency.

72.     For persons trying to become sober and stop using substances, especially methamphetamines, it is critical to have a solid support system to encourage and promote sobriety.

73.     Defendant Saiz knew Jeffrey Moody had a criminal history and also abused drugs, including methamphetamines.

74.     Defendant Saiz noted in the file that Barbara Gurule had been either missing visits or had been late to visits with Antonio. Barbara Gurule cancelled or no-showed for supervised visits with Antonio on September 4, 13, 18, and 25, 2017.

75.     On September 21, 2017, a bench warrant was issued for Barbara Gurule for her failure to appear for criminal child abuse charges associated with the September 2016 removal of Antonio.

### First Trial Home Visit

76.     On November 14, 2017, Defendants Saiz and Herrera authorized, approved and began a Trial Home Visit with Barbara Gurule and Antonio.  Throughout the Trial Home Visit, Antonio remained in the legal custody of CYFD and the placement was supervised by CYFD, through the Defendants.

77.     In a Trial Home Visit, the child lives with the parent in their home. CYFD visits the home as often as necessary in order to maintain safety for the child. CYFD also puts into place a plan and other services to help ensure the child's safety and the parent's success.

78.     At all times material to the allegations set forth in this lawsuit, Antonio was in the physical and legal custody of the State of New Mexico.

79.     As a part of the Trial Home Visit, CYFD, through Defendants, was required to maintain a regular presence in Barbara Gurule's home, ensure it was a safe and appropriate place for Antonio, assess the safety and criminal history of all adults in Barbara Gurule's home, and ensure that Barbara Gurule was getting the necessary support and services she needed in order to be a safe and functioning parent for Antonio.

80.     The goal and purpose of the Trial Home Visit was to assess and determine whether Barbara Gurule was able to safely parent Antonio on a permanent basis, while also ensuring that Antonio's safety was never put in jeopardy.

81.     As a part of the Trial Home Visit, Defendants were required to make scheduled and unannounced home visits as often as necessary in order to ensure Antonio's safety and well-being in Barbara Gurule's home.

82.     As a part of the Trial Home Visit, Defendants had the authority to require Barbara Gurule to make physical changes to the home, to require that certain persons not be allowed to live or be present in the home, and to require that certain services and conditions be met, like participating in training and education with service providers, and requiring Barbara Gurule to submit to random drug testing.

83.     At all times, Defendants had the authority and responsibility to remove Antonio from the home of Barbara Gurule if she was not complying with the conditions imposed by Defendants in order to ensure Antonio's safety and well-being.

84.     Defendants' responsibility for Antonio's safety did not change when the child started the Trial Home Visit.

85.     Defendants had an ongoing and uninterrupted obligation pursuant to New Mexico statutes and regulations to assess, evaluate, and ensure Antonio's safety at all times.

86.     During the Trial Home Visit, Defendants were required immediately to address any unsafe situation for Antonio.

87.     Defendants Saiz and Herrera authorized Antonio to start this Trial Home Visit in November 2017 despite knowing that just weeks earlier, Barbara Gurule's sister died of a drug overdose.

88.     Despite that the most significant safety threat posed by Barbara Gurule was her methamphetamine use and addiction, Defendants Saiz and Herrera did not confirm through a drug test that Barbara Gurule was sober and free of drugs, including methamphetamines, before placing Antonio in Barbara Gurule's home for the Trial Home Visit in 2017.

89.     Defendant Saiz required Barbara Gurule to do random drug tests as a part of the conditions of the Trial Home Visit because it was a mechanism she was using to protect Antonio's safety.

90.     Defendant Saiz never confirmed if Barbara Gurule was in fact completing random drug tests, and if so, the results of those drug tests.

91.     Defendant Saiz simply relied on Barbara Gurule's assertions that she was doing her drug testing through her probation requirements.

92.     Defendants know that drug addicts lie to hide their drug use.

93.     Defendant Saiz never contacted probation and never obtained any drug tests for Barbara Gurule even though she was responsible for ensuring that Barbara Gurule was complying with the drug tests as a part of ensuring Antonio's safety.

94.     On December 14, 2017, a service provider working with Barbara Gurule told Defendant Saiz that Barbara Gurule was allowing a man to stay in her home with Antonio. Barbara

Gurule had not informed CYFD and Defendant Saiz about this person so that he could be assessed and vetted for safety.

95.     Between the start of the Trial Home Visit in November 2017 and the end of January 2018, Barbara Gurule was not engaging with the home visits through Time Limited Reunification Services ("TLR") – a program that assists parents in complying with their treatment plan and ensures the safety of children on a Trial Home Visit through environmental assessments and interventions, increasing parent protective capacities of their children, self and family management, and case management and coordination.

96.     During this time, TLR reported their concerns to Defendants Saiz and Herrera as follows:

        a.      Barbara Gurule was cancelling or not showing up for her scheduled home visits;

        b.      TLR could not contact Barbara Gurule via phone call or text message;

        c.      Child safety measures had not yet been installed;

        d.      Barbara Gurule obtained a new roommate, Robert, who was renting a room in the house where she and Antonio were living;

        e.      Barbara Gurule was inconsistent with TLR services which was hindering her progress.

97.     During the Trial Home Visit, Barbara Gurule was leaving Antonio with his former foster parents for days at a time. This was concerning conduct because the Trial Home Visit is supposed to be a time in which Barbara Gurule was primarily parenting Antonio so that CYFD, through Defendants, could determine if he was safe to return to his mother permanently.

***Trial Home Visit Disruption***

98.     On January 24, 2018, Defendant Saiz and Herrera removed Antonio from Barbara Gurule's home and disrupted the Trial Home Visit because she was arrested on two outstanding warrants. She had not told CYFD about those warrants.  Antonio was placed back into a foster home.

99.     Defendants Saiz and Herrera acknowledge that having an outstanding warrant was a safety risk to Antonio because he would have no parent to care for him should Barbara Gurule get arrested.

100.     Despite removing Antonio and placing him back into a foster home, Defendants did not conduct and document a formal safety assessment as required by CYFD procedure.

101.     Despite not conducting or documenting a formal safety assessment, Defendants determined that Antonio was not safe with Barbara Gurule and thus they took action pursuant to their authority and responsibility to remove him from her home and place him back into a foster home.

102.     A month later, on February 20, 2018, Defendant Saiz had a phone call with a service provider at La Vida Felicidad.

103.     La Vida Felicidad was providing services to Antonio to try to address and improve his developmental level of function.

104.     The service provider at La Vida Felicidad reported concerns about Barbara Gurule to Defendant Saiz, including:

            a.     Barbara Gurule appeared unable to understand Antonio's needs and cues, and La Vida Felicidad wanted to increase its home visits to once per week.

16

b. During the Trial Home Visit, Antonio was present with Barbara Gurule on only two occasions; for every other appointment he was with the former foster parent because Barbara Gurule had left him there.

c. When Antonio tried to walk, Barbara Gurule and her boyfriend would swat at his bottom and laugh as he tried to re-stabilize himself.

d. Antonio was not in an appropriate nurturing environment.

e. Antonio was receiving inconsistent care in going back and forth to the former foster parent and to Barbara Gurule.

f. Barbara Gurule's relationship with her boyfriend was volatile.

105. On February 22, 2018, Barbara Gurule reported to Defendants Saiz and Herrera that she relapsed and used drugs while Antonio was in her home for the Trial Home Visit.

106. On February 22, 2018, Barbara Gurule reported to Defendants Saiz and Herrera that she would not agree to do a drug test because she would be "dirty" or would test positive for drugs.

107. During this February 22, 2018 meeting, Defendants Saiz and Herrera also discussed concerns about Barbara Gurule leaving Antonio with inappropriate caregivers.

108. In particular, during the February 22, 2018 meeting, Defendants Saiz and Herrera discussed with Barbara Gurule things that she needs to consider when leaving Antonio with anyone other than the former foster parent and that CYFD would need to assess such individuals to determine their suitability as caregivers. This discussion was in the context of Barbara Gurule allowing her boyfriend to reside in the home when he had pending charges of possession of a controlled substance.

109.    On February 22, 2018, Defendants' concerns about Antonio included the following: (a) Barbara Gurule leaving Antonio with the foster parents for an inappropriate amount of time; (b) Barbara Gurule's failure to comply with the conditions of her alleged probation; (c) Barbara Gurule's failure to complete her urinalysis screenings for drug testing; (d) the people in Barbara Gurule's home, including their criminal history; and (e) the need to assess anyone living in her home.

110.    Defendants' concern that Barbara Gurule's failure to comply with the urinalysis drug screenings went directly to one of the identified safety threats for Antonio that had been in place since September, 2016 – Barbara Gurule's long-time methamphetamine addiction.

111.    Defendants and CYFD considered that any missed urinalysis screening or drug test was considered a positive drug test – "a missed UA is like a dirty".

112.    Defendants Saiz and Herrera knew that Barbara Gurule's noncompliance with the urinalysis drug screenings was a barrier to and threatened Antonio's safety.

113.    Also, during this February 22, 2018 meeting, Defendants Saiz and Herrera informed Barbara Gurule that they would not start another Trial Home Visit with her and Antonio until Barbara Gurule had completed a neuropsychological evaluation with Dr. Sandra Montoya.

114.    On February 22, 2018 Defendants concluded, but did not document, that Antonio was not safe with Barbara Gurule because of the ongoing substance use and relapse, the individuals in her home, and her inability to provide consistent and appropriate care to Antonio.

115.    On March 9, 2018, Defendants Saiz and Herrera held a supervisory meeting on this case.  During that meeting, Defendants discussed the following concerns:

     a.    Barbara Gurule leaving Antonio with different caregivers;

     b.    Barbara Gurule's recent drug use relapse;

> c.   Barbara Gurule's age-appropriate understanding of Antonio;
>
> d.   Barbara Gurule's judgment; and
>
> e.   Barbara Gurule's noncompliance with her urinalysis drug screens.

116.    Defendants did not document this March 9, 2018 meeting until September 10, 2018, after Antonio's death. The documentation states that Barbara Gurule was "very honest" despite that there were multiple instances in which Defendant Saiz was aware of Barbara Gurule misleading and lying to her in the weeks and months leading up to the March 9, 2018 meeting.

117.    The late documentation also states that Barbara Gurule was "clean 6 months" (that she had not used drugs including methamphetamines for 6 months) despite the fact that Defendants knew she relapsed just one month earlier and had never obtained a drug screen to confirm that she was now sober.

118.    Defendants specifically identified the following risk during the March 9, 2018 meeting:

> *"[C]ould mother [Barbara Gurule] safely protect Antonio (especially with men in her life)?"*

119.    At the March 9, 2018 meeting, Defendants did not conduct a new safety assessment of the risks and dangers of Barbara Gurule to Antonio, and instead relied on the old safety assessment that had been completed months earlier at the time the Trial Home Visit began.

120.    Defendants did not conduct a new formal safety assessment despite significant additional information about Barbara Gurule's behavior, drug use, criminal conduct, and parenting concerns regarding Antonio that had become known to Defendants over the past three months, which had resulted in the disruption of the Trial Home Visit and removal of Antonio in January 2018.

121.    As a result, Defendants documented Antonio as "safe" with Barbara Gurule during this March 9, 2018 meeting.

122.    On March 15, 2018, Defendant Saiz received a copy of the neuropsychological report from Dr. Montoya's assessment of Barbara Gurule. Dr. Montoya documented that CYFD's records were not available for her review and so the evaluation could not look at Barbara Gurule's current functioning.

123.    Dr. Montoya's report recommended to Defendant Saiz and CYFD that Barbara Gurule complete regular drug tests because of her long history of drug use.

124.    Defendant Saiz never contacted Dr. Montoya to discuss the report or her recommendations. Defendant Saiz never followed up with Dr. Montoya to provide her with the documentation she required for the evaluation.

125.    Defendant Saiz admitted she did not have the education, training or expertise to evaluate persons with drug addiction. She thus relied upon professionals, like Dr. Montoya, to instruct her on how to address this long-term drug dependence.

***Second Trial Home Visit***

126.    Despite the significant concerns identified regarding the safety of Antonio in the past few months, Defendants approved a second Trial Home Visit with Barbara Gurule.

127.    Defendants placed Antonio with Barbara Gurule on May 10, 2018, only four months after the first Trial Home Visit was disrupted and only three months after Defendants learned that Barbara Gurule had relapsed and used drugs.

128.    CYFD policy and procedure required that a formal assessment of Antonio's safety be conducted through the New Mexico Child Safety Assessment prior to placing the child on a Trial Home Visit.

129.    CYFD policy and procedure also required that the Permanency Planning Worker's supervisor review and approve the completed Child Safety Assessment prior to placing the child on a Trial Home Visit.

130.    Despite CYFD's clear policy and procedure, Defendants Saiz and Herrera did not conduct a formal assessment of Antonio's safety with Barbara Gurule before placing him in her home on the second Trial Home Visit. That safety assessment was not completed until two weeks after Defendants placed Antonio back with Barbara Gurule.

131.    Even though Barbara Gurule was far from ready to safely parent Antonio, Defendants pushed the Trial Home Visit to start sooner than it should have because Antonio's foster parents were moving out of state and Defendants did not want to put him into a different foster home.

132.    Defendants pushed for the Trial Home Visit to start even though they knew Barbara Gurule would have less support than before because at that time there would be no TLR services to do home visits and help provide support.

133.    Defendants also knew that Barbara Gurule would have less support than the first Trial Home Visit because the foster parents to Antonio were moving and would not be available to help Barbara Gurule with Antonio.

134.    Defendants never confirmed that Barbara Gurule was drug-free before assessing her for safety and before placing Antonio into her home on the second Trial Home Visit.

135.    Defendants never independently determined who was living in Barbara Gurule's home.  They chose to rely solely upon Barbara Gurule's reports of who was living in the home even though Defendants were aware that Barbara Gurule had been untruthful with them several times, including with regard to who was in the home and their criminal/drug use histories.

136.    Antonio was not quite two years old at the time Defendants placed him into Barbara Gurule's home for the second Trial Home visit in May 2018.

137.    At the time Defendants placed Antonio into Barbara Gurule's home, she lived with Larrie Gurule, her brother, and his minor son.

138.    Larrie Gurule was also a drug addict and was currently on probation for charges related to being passed out in his vehicle that was still running.

139.    Larrie Gurule's young son was in the car and methamphetamine and a pipe were found on his person during that incident.

140.    Defendants were aware that Larrie Gurule was residing in the home with Barbara Gurule and Antonio.

141.    At the time that Defendants placed Antonio in the home of Barbara Gurule in May 2018, Jeffrey Moody also lived in the home.

142.    Jeffrey Moody was a long-time friend/associate of Barbara Gurule.

143.    Jeffrey Moody had an extensive history of drug use and criminal conduct.

144.    In 2010, Jeffrey Moody was indicted by grand jury for aggravated battery and child abuse.

145.    Jeffrey Moody smoked methamphetamine daily since approximately 2010.

146.    Jeffrey Moody smoked methamphetamine throughout the time that he was living in Barbara Gurule's home with Antonio.

147.    Barbara Gurule relied upon Jeffrey Moody to care for Antonio during the second Trial Home Visit.

148.    There were instances when Barbara Gurule would leave Antonio with Jeffrey Moody for days at a time.

149.    On May 24, 2018 – two weeks after the second Trial Home Visit began – Defendant Saiz attempted a home visit but no one was home and the gate was locked.  Defendant Saiz did not see Antonio that day.

150.    Defendant Saiz was able to conduct a home visit with Barbara Gurule the next day on May 25, 2018. During the home visit, she documented that the urinalysis drug screens will be "court-ordered at next hearing per neuropsych".

151.    On May 29, 2018 Defendants Saiz and Herrera filed a report with the Court. In that report, they informed the Court that the previous Trial Home Visit had been disrupted but they did not inform the Court that Barbara Gurule relapsed and used methamphetamines while Antonio was in her home.

152.    Defendants also informed the Court that Barbara Gurule's home had working utilities even though they knew or should have known that Barbara Gurule's home was illegally connected to electricity by way of an extension cord.

153.    Defendants recommended to the Court, and the Court ordered consistent with their recommendation, that "Barbara will maintain safe and stable housing for herself and her son" and that Defendants were responsible for assessing the home for safety and appropriateness on an ongoing basis.

154.    Defendants also recommended, and the Court also ordered consistent with the recommendation, that Barbara Gurule would participate in random drug screens, as arranged by CYFD and Defendants.

155.    Defendants were responsible for arranging random drug screens and for monitoring their results so that they could react effectively in the event there were indicators Barbara Gurule was using drugs again.

156.    Defendant Saiz knew that one of the most significant concerns for Antonio's safety revolved around Barbara Gurule's drug use.

157.    Defendants Saiz and Herrera were responsible to evaluate Antonio's safety regarding Barbara Gurule's substance abuse.

158.    Defendants knew that if Barbara Gurule was using methamphetamine during the Trial Home Visit, it would have put Antonio at a high risk of danger.

159.    On June 18, 2018, a bench warrant was issued for Barbara Gurule relating to her February 14, 2017 shoplifting charge.  Defendant Saiz was aware of the outstanding warrant.

160.    Despite being aware of the outstanding warrant, Defendant Saiz did not take any action to protect Antonio's safety.

161.    In July 2018, Defendant Saiz was made aware that Barbara Gurule had not shown up for any of the urinalysis drug screenings in June that were ordered by the Court and in place for Antonio's safety.

162.    Defendants knew that Barbara Gurule's refusal to provide drug tests indicated she was unwilling to make the sacrifices necessary to protect Antonio.

163.    Defendants acknowledge that as a result of not requiring Barbara Gurule to comply with the random drug tests, that decision allowed Barbara Gurule to abuse methamphetamines during the second Trial Home Visit when Antonio was placed in her home.

164.    During a July 5, 2018 home visit, Barbara Gurule again provided Jeffrey Moody's name to Defendant Saiz as a person who was a family support and someone for her to call in case of an emergency.

165.    Also, during the July 5, 2018 home visit, Barbara Gurule reported to Defendant Saiz that she had done two urinalysis drug screens and they would not be positive for any substance.

166.    Defendants never verified that Barbara Gurule actually submitted to the urinalysis drug screens as she was reporting.

167.    On July 11, 2018, Defendant Saiz conducted a home visit in which Jeffrey Moody was present in the home with Barbara Gurule and Antonio.

168.    On July 20, 2018, Defendant Saiz received an email from La Vida Felicidad, the agency that was supposed to be working with Antonio on his developmental milestones.

169.    La Vida Felicidad reported to Defendant Saiz that its providers were concerned about Antonio because they had not seen him, Barbara Gurule was not keeping appointments, and she was not responding to calls, emails or texts.

170.    Also on July 20, 2018, Barbara Gurule failed to show up for her appointment with her therapist.

171.    Defendant Saiz did a home visit on July 19 or 20, 2018.

172.    According to Defendant Saiz's documentation of this visit, Barbara Gurule was not at home, but Antonio had been left at the home alone with Jeffrey Moody. Defendant Saiz did not document this visit into the file until after Antonio's death.

173.    Jeffrey Moody reported that Barbara Gurule had gone to a trailer down the road. Defendant Saiz went to the location where Jeffrey Moody directed her but could not find Barbara Gurule.

174.    Defendant Saiz left Antonio with Jeffrey Moody despite not knowing where Barbara Gurule was or when she would return.

175.    Defendant Saiz also was aware that Jeffrey Moody was not someone identified as an authorized caregiver for Antonio.

176.    Defendant Saiz was concerned about Antonio being left alone with Jeffrey Moody because she was not aware that he would be serving as a caregiver to Antonio.

177.    Defendant Saiz was required to investigate whether Jeffrey Moody understood Antonio's needs and could provide safe care for Antonio.

178.    However, Defendants never investigated whether Jeffrey Moody understood Antonio's needs and never investigated Jeffrey Moody's fitness to provide care for Antonio.

179.    Defendants made no assessment of Antonio's safety with respect to Jeffrey Moody.

180.    On July 23, 2018 Barbara Gurule missed Antonio's scheduled doctor appointment.

181.    That same day, Defendant Saiz met with Barbara Gurule in her home.

182.    Barbara Gurule reported that Antonio's Medicaid was inactive and she would get a ride to the Human Services Department to correct that issue.

183.    Defendant Saiz also learned that Barbara Gurule spanked Antonio as a form of discipline.

184.    On July 24, 2018, La Vida Felicidad emailed Defendant Saiz and reported that Barbara Gurule did not show up for the scheduled appointment again.  La Vida Felicidad reported that when they went to the home, there was a truck in the driveway, the TV was on, but no one answered the door.

185.    On July 26, 2018, Barbara Gurule cancelled her home visit with Defendant Saiz.

186.    On July 27, 2018, Defendant Saiz visited Barbara Gurule at her home. Defendant Saiz learned from Barbara Gurule that when Antonio needed medical care for an injury, the medical providers would not see him because his Medicaid was inactive.

187.    By the beginning of August, Defendants knew that Barbara Gurule had not shown up for a single one of the court-ordered urinalysis screenings for the months of June and July.

188.    At that point, Defendant Saiz also knew that Barbara Gurule lied on July 5, 2018 when she told Defendant Saiz that she had done two urinalysis drug screenings and they would not be positive.

189.    Defendant Saiz had concerns about Barbara Gurule's substance use and parenting in July 2018 given the lack of urinalysis drug screenings and the missed visits.

190.    Defendant Saiz spoke with Defendant Herrera about Barbara Gurule's lack of compliance with the urinalysis drug screenings.

191.    During an August 2 or 3, 2018 home visit, Barbara Gurule again reported Jeffrey Moody as a person who is a family support and someone for her in case of an emergency.

192.    Also during the August 2 or 3, 2018 home visit, Barbara Gurule informed Defendant Saiz that she had not been able to call in for her urinalysis drug screens without a phone.

193.    However, during the August 2 or 3, 2018 home visit, Barbara Gurule informed Defendant Saiz that she called the social security office about her social security check and was "expecting a call back."

194.    Defendant Saiz ignored the inconsistencies about access to a phone reported by Barbara Gurule.

195.    On August 9, 2018, Defendant Saiz met with Barbara Gurule in her home. In that visit she learned that Antonio was still not registered for school even though this subject had been raised with her for the past two months.

196.    On August 16, 2018, Defendant Saiz met with Barbara Gurule in her home.

197.    During the August 16, 2018 visit, Defendant Saiz learned that Barbara Gurule had not done her urinalysis drug screening because she did not have a ride.

198.    Defendant Saiz returned to Barbara Gurule's home on August 23, 2018.

199.    During the August 23, 2018 visit, Barbara Gurule reported to Defendant Saiz that Barbara Gurule's phone was not working but she told Defendant Saiz that she would use Larrie's phone or a friend's phone to call for her urinalysis drug screening.

200.    During the August 23, 2018 visit, Defendant Saiz was unable to examine the entire home because a bedroom door was left locked and Barbara Gurule refused to open it.

201.    During the August 23, 2018 visit, Barbara Gurule informed Defendant Saiz that she believed Antonio had a seizure two days earlier because his eyes rolled back and he was convulsing.

202.    During the August 23, 2018 visit, Defendant Saiz learned that Barbara Gurule did not call 911 or obtain any medical treatment for Antonio as a result of the perceived seizure.

203.    Defendant Saiz did nothing as a result of the information she learned or was reasonably available to her during the August 23, 2018 visit.

204.    Defendant Saiz arrived at Barbara Gurule's home on August 30, 2018, but Barbara Gurule and Antonio were not present despite the scheduled appointment. Jeffrey Moody was at the home and spoke with Defendant Saiz.

205.    During the August 30, 2018 visit, Defendant Saiz observed a broken window with glass both outside and inside the home.

206.    Later that day on August 30, 2018, Barbara Gurule came to the CYFD office.

207.    At the CYFD office, Barbara Gurule reported to Defendant Saiz that Antonio was in the car with her friend Wendy, someone whom Defendant Saiz was not aware was involved with Antonio and who CYFD had not evaluated for safety.

208.    Barbara Gurule reported to Defendant Saiz that she was not leaving Antonio with Wendy or anyone.

209.    Barbara Gurule's report of not leaving Antonio with anyone was contrary to Defendant Saiz's knowledge of Barbara Gurule leaving Antonio with Jeffrey Moody for at least several hours.

210.    Defendants knew that Barbara Gurule had not completed any of the court-ordered urinalysis drug screens throughout the time of the second Trial Home Visit.

211.    Throughout the time of the second Trial Home Visit, Defendants were aware that Barbara Gurule:

        a.      Missed home visits with Defendant Saiz;

        b.      Missed home visits with La Vida Felicidad;

        c.      Left Antonio with unapproved caregivers;

        d.      Failed to register Antonio for school;

        e.      Failed to ensure Antonio had Medicaid to enable him access to medical treatment;

        f.      Missed medical appointments scheduled for Antonio;

        g.      Failed to follow up on the referral for Antonio to see a medical specialist;

        h.      Failed to take Antonio to the doctor for evaluation after a potential seizure;

        i.      Failed to follow up with Social Security regarding her monthly payments – her sole source of income; and

      j.     Gave inconsistent statements about her access to vehicles and telephones as to her drug tests.

212.    At all times during the second Trial Home Visit, Defendants had the authority and responsibility to remove Antonio from the home of Barbara Gurule if she was not complying with the conditions imposed by Defendants in order to ensure that Antonio's safety and well-being were not jeopardized.

213.    Despite having this unquestioned authority and responsibility, Defendants chose not to remove Antonio from Barbara Gurule's home even though they were concerned about his safety.

***Antonio's Death***

214.    On September 3, 2018, Valencia County Sheriff's Department (VCSD) was dispatched to Barbara Gurule's home because Antonio was found unresponsive.  He was pronounced dead soon after.

215.     The Office of the Medical Investigator concluded Antonio's death was a homicide as "the injuries identified on Antonio were significant, multiple, and non-accidental."

216.    The Office of the Medical Investigator identified the following injuries to Antonio during autopsy:

      a.     severe and multiple blunt head injuries;

      b.     bruising of the scalp and bleeding within and underneath the scalp;

      c.     a fracture of the skull crossing and widening the skull suture lines;

      d.     bleeding around and swelling of the brain leading to brain tissue herniation;

      e.     bleeding in the cervical spine including the dorsal root ganglia;

      f.     insufficient oxygen and blood flow changes of the brain;

g.    bruise of the left temporal pole of the brain;

h.    diffuse, marked traumatic axonal injury;

i.    bruising to the right cheek, chest, back, left shoulder, and back of right elbow; and

j.    soft tissue tearing of the inside of the lower lip.

217.    The Office of the Medical Investigator concluded that Antonio's injuries were due to significant force to his head from multiple directions.

218.    The cause of Antonio's death was "blunt head trauma." The manner of death was ruled "homicide."

***Law Enforcement and CYFD Investigation of Antonio's Death***

219.    VCSD and CYFD's Investigations Department conducted investigations into the circumstances of Antonio's death.

220.    The investigations revealed the following regarding the condition of Barbara Gurule's home:

a.    Barbara Gurule's home was vile. There was a toilet with trash in it and clothes and items covering the floor so it was barely possible to open the door. There was no trash receptacle in some rooms and toilet paper with human feces and diapers were piled on the floor.

b.    There were cockroaches crawling in the skink, in the dishes, and along the walls of the bathroom and shower.

c.    There were small black bugs on the kitchen floor and in the bathtub.

d.    The yard was filled with trash and scrap metal. There were many garbage bags all over the yard, ripped and with the contents spilled out.

e.     All of the windows were blacked out with blankets, dark sheets or boards.

f.     The home was illegally hooked up to electricity by way of an extension cord.

g.     There was minimal food in the refrigerator and freezer.

h.     Antonio did not sleep in the same room as his mother, but slept on the other side of the house in the same room as Jeffrey Moody – a non-relative and alleged "caretaker" for Antonio.

221.    None of the Defendants ever documented any of these conditions in the home despite being present just days before.

222.    VCSD and CYFD's investigations also revealed:

a.     Barbara Gurule admitted to being on methamphetamines at the time of Antonio's death and she had left Antonio in the care of Jeffrey Moody.

b.     Barbara Gurule admitted to using methamphetamines multiple times while she had Antonio in her care during the Trial Home Visit.

c.     Barbara Gurule admitted that Jeffrey Moody also used methamphetamines.

d.     Jeffrey Moody had been living in Barbara Gurule's home for the past 6 – 8 months.

e.     Barbara Gurule would leave Antonio with Jeffrey Moody for long periods of time, including for up to three days.

223.    As a part of its investigation, CYFD conducted a safety assessment and identified the following safety threats:

a.  There is reasonable cause to suspect that a member of the household caused serious physical harm or has made a plausible threat of physical harm to the children.

b.  There is a serious injury for which there is no reasonable or credible explanation.

c.  The caregivers will not provide supervision necessary to protect the children from present or impending danger.

d.  The caregivers leave the children alone and the children are not competent to care for themselves, or caregiver leaves the children with persons unwilling or unable to provide adequate care, placing the children in present or impending danger of serious harm.

e.  A household member has previously abused or neglected a child and the severity of the maltreatment, or the caregiver's response to the prior incident, places the children in present or impending danger of serious harm.

f.  The household environment or living conditions place the children in present or impending danger of serious harm.

g.  Caregiver's impairment due to drug or alcohol use seriously affects his/her ability to supervise, protect or care for the children placing the children in present or impending danger of serious harm.

224.  The Safety Assessment did not identify a single protective capacity by Barbara Gurule that would mitigate against the multitude of identified risks. Instead, CYFD concluded that the children were unsafe.

225.    CYFD concluded Barbara Gurule's home was inadequate for children the age of Antonio and Larrie Gurule's son to be residing. This conclusion was reached despite that Defendant Saiz allegedly was out at the home conducting weekly home visits to assess and evaluate the safety of the home for Antonio in the days and weeks before his death.

226.    CYFD further concluded that Barbara Gurule left her son willingly for large amounts of time in the care of another person who failed to supervise and act appropriately when the child was injured resulting in the death of the child.

227.    Jeffrey Moody was arrested and indicted for the murder of Antonio.

228.    On August 7, 2019, Jeffrey Moody pleaded guilty to reckless child abuse resulting in the death of Antonio.

229.    Barbara Gurule was indicted on several counts in connection with Antonio's death. Those counts include: (a) Intentional Abuse of a Child Resulting in Death; (b) Abuse of a Child Resulting in Death; (c) Conspiracy to Commit Child Abuse Resulting in Death; and (d) Conspiracy to Commit Intentional Abuse of a Child Resulting in Death. She is currently being prosecuted for those crimes.

230.    CYFD substantiated its allegations of (a) Physical Neglect (inadequate shelter) of Antonio by Barbara Gurule, Jeffrey Moody and Larrie Gurule; (b) Physical Neglect of Antonio by Barbara Gurule; (c) Physical Neglect (lack of supervision) of Antonio by Barbara Gurule; and (d) Physical Abuse of Antonio Gurule by Jeffrey Moody.

***Defendants Saiz and Herrera's Records Relating to Antonio***

231.    Defendants Saiz and Herrera were the primary CYFD workers and supervisors assigned to and responsible for assuring Antonio's safety and for monitoring his placement with Barbara Gurule while he was in CYFD custody.

34

232.    Pursuant to CYFD policy and procedure, Defendants Saiz and Herrera were required to maintain contemporaneous records of their meetings, visits and actions on Antonio's case.

233.    Defendants Saiz and Herrera did not enter their notes of the actions taken on Antonio's case into CYFD's computerized log until after Antonio's death.

234.    Beginning on September 6, 2018, three days after Antonio's death, Defendants Saiz and Herrera entered nearly two years' worth of visitation and supervision notes as well as notes of every single action taken about Antonio's case into his file and back-dated it into the CYFD electronic file system.

235.    Defendants Saiz and Herrera then destroyed all handwritten notes concerning Antonio's case.

236.    On September 6, 2018, after Antonio died, Defendant Saiz entered notes for 14 home visits into the CYFD electronic file in the course of 4 minutes.

237.    Also after Antonio died, Defendant Herrera entered all of her notes from her work on Antonio's case over the almost two years in approximately 25 minutes.

238.    Defendant Saiz entered all of her notes for all of her work as the Permanency Planning Worker, including all home visits, supervised visitation, contacts with Antonio, contacts with Barbara Gurule, contacts with other persons regarding this case, in approximately three hours.

239.    Defendant Chavez-Buie authorized and ratified Defendants Saiz's and Herrera's late entries.

240.    Defendant Chavez-Buie authorized and ratified Defendants Saiz's and Herrera's destruction of notes.

241.    According to the late entered documentation, Defendants knew that Barbara Gurule used Jeffrey Moody as a support to her as early as August 14, 2017 – over a year before Antonio's death.

242.    According to the late entered documentation, Defendants knew that Jeffrey Moody was in the home of Barbara Gurule since at least July 11, 2018.

243.    According to the late entered documentation, Defendants knew that Barbara Gurule left Antonio alone with, and in the unsupervised care of, Jeffrey Moody for, at least, hours at a time.

244.    Defendants knew Jeffrey Moody had not been scrutinized or approved to provide care for Antonio or be left alone, unsupervised with Antonio.

**Count I**
**Civil Rights Claim Against Defendants Saiz, Herrera, and Chavez-Buie –**
**<u>Special Relationship – Failure to Protect</u>**

245.    All previous allegations are incorporated by reference as if fully set forth herein.

246.    Antonio had a fundamental right, protected by the Fourteenth Amendment to the United States Constitution, not to be placed in an improper, inadequate, or injurious environment by the State of New Mexico, through its departments, officers, employees and agents, including Defendants Saiz, Herrera, and Chavez-Buie.

247.    Once Antonio had been removed from his biological parents and was within the State of New Mexico's legal custody and physical control, Antonio was wholly dependent for his basic human needs such as food, shelter, clothing, personal care, medical care, safety and welfare on the caregivers selected for him by the State of New Mexico, including his biological mother.

248. Defendants Saiz, Hererra, and Chavez-Buie were employees of CYFD who engaged in a series of actions and judgments that resulted in the improper and unsafe placement of Antonio with Barbara Gurule.

249. At all times material to the allegations set forth in this lawsuit, Defendants had exclusive authority, pursuant to the New Mexico Children's Code and state regulations, to determine the placement where Antonio would live.

250. At all times material to the allegations set forth in this lawsuit, Defendants had exclusive authority and were required to ensure Antonio's safety, permanency and well-being.

251. While Antonio was on a Trial Home Visit and living in the home of Barbara Gurule, Defendant Saiz was required pursuant to CYFD's policies and procedures to conduct home visits on a weekly, bi-weekly, or monthly basis.

252. At any point during the Trial Home Visit Defendants Saiz, Herrera, and Chavez-Buie had the authority to enter the home of Barbara Gurule and conduct a home visit unannounced.

253. By October 3, 2016, days after Antonio came into custody, Defendants Saiz, Herrera, and Chavez-Buie knew that the reasons for Antonio's removal from Barbara Gurule's home and the immediate threats to his safety were a result of (a) her methamphetamine addiction; and (b) the physical state of her home, caused by her drug addiction.

254. As of at least March 9, 2018, Defendants Saiz, Herrera, and Chavez-Buie knew the risks to Antonio's safety posed by Barbara Gurule were her methamphetamine addiction, including her recent relapse, and her ability to have appropriate and safe men around Antonio.

255. Defendants knew but ignored pertinent information, detailed herein, indicating that Antonio was not safe with Barbara Gurule and was at risk of grievous harm. Defendants were aware of the following safety threats to Antonio in the months leading up to his death:

a.    Barbara Gurule was not completing the mandatory and court-ordered urinalysis drug screens to confirm if she was or was not abusing drugs including methamphetamine. Defendants considered that a failure to complete a urinalysis drug screen resulted in the assumption that any test would have been positive for drug substances.

b.    The random urinalysis drug screenings also had been recommended by the neuropsychologist who conducted an evaluation of Barbara Gurule given her decades-long history of drug abuse.

c.    Barbara Gurule was missing home visits with Defendant Saiz, an important part of ensuring Antonio's safety while on the Trial Home Visit.

d.    Barbara Gurule was missing home visits with La Vida Felicidad, another important part of ensuring Antonio's safety while on the Trial Home Visit.

e.    Jeffrey Moody was in Barbara Gurule's home with unsupervised access to Antonio.

f.    Barbara Gurule was leaving Antonio to be cared for by Jeffrey Moody.

g.    Barbara Gurule regularly had new persons in the home who had not been assessed by CYFD.

h.    Barbara Gurule failed to register Antonio for school.

i.    Barbara Gurule failed to ensure that Antonio had access to medical care through having Medicaid.

j.    Barbara Gurule was missing scheduled medical appointments for Antonio.

k.    Barbara Gurule was not following up on referrals to medical specialists for Antonio.

l.      Barbara Gurule had issues with understanding Antonio's needs.

m.      Barbara Gurule lied to Defendants about a number of matters including having warrants out for her arrest, not complying with the terms of her probation, the people she allowed in her home and with access to Antonio, lied about her use of methamphetamine while Antonio was in her home during the first Trial Home Visit, and lied about completing urinalysis drug screenings during the second Trial Home Visit.

n.      Barbara Gurule reported Antonio had a seizure and yet did not take him to get medical attention and evaluated.

o.      Barbara Gurule had a history with CYFD regarding concerns of abuse and neglect of her seven (7) children since 1997 as a result of her methamphetamine addiction. For all of her children, except Antonio, Barbara Gurule's parental rights were either terminated or she relinquished her rights to them.

p.      Barbara Gurule had been a decades long abuser of methamphetamine.

q.      Barbara Gurule had at least two known relapses while Antonio was in CYFD custody.

r.      Barbara Gurule's compliance with urinalysis drug screenings was critical for Antonio's safety.

s.      Barbara Gurule's refusal to comply with the urinalysis drug screenings indicated her unwillingness to make necessary sacrifices to protect Antonio.

256.      In ignoring all of Defendants' knowledge set forth herein, Defendants Saiz, Herrera, and Chavez-Buie failed to exercise professional judgment by:

a.  Allowing Barbara Gurule to go for almost two years without submitting to a single court-ordered urinalysis drug screen to confirm whether she was abusing drugs, including methamphetamine. Defendant Saiz and Herrera ignored the clear order by the Court that Barbara Gurule complete these random drug screens as a condition of the abuse and neglect case.

b.  Failing to enforce the court-ordered required urinalysis drug screenings for Barbara Gurule, which allowed her to abuse methamphetamines on the Trial Home Visit with Antonio in the home.

c.  Concealing the fact that Barbara Gurule was not completing the court-ordered urinalysis drug screens from the Court and the court-appointed Guardian Ad Litem for Antonio.

d.  Concealing from the Court and the court-appointed Guardian Ad Litem that Barbara Gurule relapsed and used methamphetamine during the first Trial Home Visit.

e.  Pushing for and approving the second Trial Home Visit in May 2018 simply because Antonio's current foster parents were moving and not considering that only two months earlier Barbara Gurule relapsed using methamphetamine.

f.  Failing to conduct any urinalysis drug screens prior to the second Trial Home Visit to confirm that Barbara Gurule was not abusing drugs, including methamphetamine.

g.  Allowing Barbara Gurule to have Jeffrey Moody in her home and to watch Antonio despite his history of child abuse charges, drug abuse, and criminal history.

h.  Despite knowing Jeffrey Moody was taking care of Antonio, Defendants never investigated his fitness and Antonio's safety with Jeffrey Moody.

i.  Allowing Barbara Gurule to have Larrie Gurule living in her home despite his abuse of methamphetamine and his recent criminal history.

j.  Placing Antonio with Barbara Gurule for the second Trial Home Visit with less resources and supports than were in place during the first Trial Home Visit when she relapsed and failed to parent Antonio.

k.  Placing and then allowing Antonio to be with Barbara Gurule for the second Trial Home Visit despite the physical condition of her home, the multiple dangers for a young child, and that the home only had electricity through illegal means. Just hours after Antonio was discovered dead, CYFD's investigation observed the home to have cockroaches in the sink, on the dishes and on the walls of the bathroom and shower; small black bugs on the kitchen floor and in the bathtub; dirty diapers and tissue paper with human feces piled on the floor; and minimal food in the home. CYFD reached this conclusion despite Defendant Saiz purportedly being in the home weekly, including just days before Antonio's death.

l.  Failing to conduct any supervision of Defendant Saiz on this case between June, 2018 and the date of Antonio's death on September 3, 2018.

257. Defendants Saiz, Herrera, and Chavez-Buie recklessly and willfully ignored pertinent information of which they were aware, detailed herein, that directly addressed the identified risk to Antonio – Barbara Gurule's drug abuse and her inability to protect Antonio from the men in her life.

258. Defendants Saiz, Herrera, and Chavez-Buie recklessly ignored and willfully bypassed established professional procedures and court orders and departed from accepted professional practices and standards in making the decisions to place Antonio with Barbara Gurule and maintain him in that placement.

259. Defendants Saiz, Herrera, and Chavez-Buie further recklessly ignored and willfully bypassed established professional procedures and departed from accepted professional practices and standards when they knew that Barbara Gurule was not completing the required urinalysis drug screening which, for them, demonstrated that she would have tested positive for drugs, and then allowed Antonio to remain in her home without any changes made to ensure his safety.

260. Defendants Saiz, Herrera, and Chavez-Buie further recklessly ignored and willfully bypassed established professional procedures and departed from accepted professional practices and standards when they failed to communicate with Barbara Gurule's alleged probation officer to (a) understand the terms of her probation; and (b) confirm whether Barbara Gurule was doing any urinalysis drug screening through probation and, if so, the results of such drug testing. Such communication would have served to identify whether Barbara Gurule was lying and misleading Defendants and CYFD.

261. Had Defendants independently assessed if Barbara Gurule was actually on probation, they would have learned that Barbara Gurule was lying as there is no record of Barbara Gurule being on probation or pre-trial services during the time Antonio was in CYFD custody.

262.    During the time Antonio was in the legal and physical custody of CYFD, the official data management system for CYFD was known as the Family Automated Client Tracking System (FACTS).  The purpose of this system was to provide and maintain comprehensive, accurate and current information related to children in CYFD custody, their caregivers and other pertinent information needed by social work professionals to exercise their professional judgment.

263.    Defendants Saiz and Herrera had a professional duty to keep timely, accurate and contemporaneous records pertaining to Antonio, and to document into Antonio's FACTS case file all notes and interactions pertaining to Antonio's placement, home visits, contacts with Antonio or Antonio's mother, contacts with any adult in Antonio's placement environment, contacts with anyone regarding the case, and anything relating to Antonio's safety, permanency, and well-being. Defendants Saiz and Herrera were expected and required to ensure such documentation was entered at least monthly.

264.    As the County Office Manager, Defendant Chavez-Buie had a professional duty to:

a.    Review Antonio's FACTS case file on a monthly basis to ensure Antonio's safety, permanency, and well-being;

b.    Review Antonio's case file to confirm through drug tests that Barbara Gurule was sober and free of drugs, including methamphetamines, before placing Antonio in Barbara Gurule's home;

c.    Review Antonio's FACTS case file on a monthly basis before making, approving, or ratifying any decisions affecting Antonio's safety, permanency, and well-being;

d.    Train and require Defendants Saiz and Herrera to make timely entries into Antonio's FACTS case file on a monthly basis;

e.  Require CYFD employees working on Antonio's case, like Defendants Saiz and Herrera, to make timely entries into Antonio's FACTS case file on a monthly basis;

f.  Supervise Defendants Saiz and Herrera to ensure that they made timely entries into Antonio's FACTS case file on a monthly basis;

g.  Discipline Defendants Saiz and Herrera if they did not make timely entries into Antonio's FACTS case file on a monthly basis; and

h.  Protect and preserve all potentially relevant evidence, communication, and documentation on Antonio's case.

265.  As the County Office Manager, Defendant Chavez-Buie abdicated her professional duties to Antonio by:

a.  Never reviewing Antonio's FACTS case file;

b.  Making decisions on Antonio's safety, permanency, and well-being without reviewing Antonio's FACTS case file or confirming through a drug test that Barbara Gurule was sober and free of drugs, including methamphetamines, before placing Antonio in Barbara Gurule's home;

c.  Never reviewing Antonio's FACTS case file to realize that Defendants Saiz and Herrera failed to make any monthly entries into Antonio's FACTS case file;

d.  Never reviewing Antonio's FACTS case file to realize that Defendants Saiz and Herrera failed to document any notes pertaining to Antonio's placement, home visits, contacts with Antonio or Antonio's mother, contacts with any adult in Antonio's placement environment, and anything relating to Antonio's safety, permanency, and well-being for the preceding month;

e.  Failing to train and require Defendants Saiz and Herrera to make timely entries into Antonio's FACTS case file on a monthly basis

f.  Failing to require CYFD employees working on Antonio's case, like Defendants Saiz and Herrera, to make timely entries into Antonio's FACTS case file on a monthly basis;

g.  Failing to supervise Defendants Saiz and Herrera to make timely entries into Antonio's FACTS case file on a monthly basis;

h.  Failing to discipline Defendants Saiz and Herrera if they did not make timely entries into Antonio's FACTS case file on a monthly basis; and

i.  Failing to protect and preserve all potentially relevant evidence, communications, and documentation on Antonio's case.

266.  Defendant Chavez-Buie reviewed Antonio's FACTS case file only <u>after</u> Antonio died.  At that point, there was nothing that Defendant Chavez-Buie could have done to ensure that Antonio was provided with a safe environment and was not in danger at the hands of the caregiver selected for him by CYFD.

267.  Directly contrary to her professional duties as the County Office Manager, Defendant Chavez-Buie did not review any monthly FACTS case file notes until after a child in CYFD's custody suffers severe, catastrophic, or deadly injuries.

268.  Directly contrary to her professional duties as the County Office Manager, Defendant Chavez-Buie authorized CYFD employees like Defendant Saiz and Herrera to refrain from or delay documenting monthly FACTS case file notes until after a child in CYFD's custody suffers severe, catastrophic, or deadly injuries.

269.    Directly contrary to her professional duties as the County Office Manager, Defendant Chavez-Buie authorized CYFD employees like Defendant Saiz and Herrera to document nearly two years' worth of FACTS case file notes in a matter of hours after a child suffers severe, catastrophic, or deadly injuries.

270.    Directly contrary to her professional duties as the County Office Manager, Defendant Chavez-Buie authorized CYFD employees like Defendant Saiz and Herrera to destroy and delete potentially relevant evidence, communications, and documentations on Antonio's case.

271.    Defendant Chavez-Buie's abdication of her professional duties was reckless and shocks the conscious.

272.    Defendant Chavez-Buie's abdication of her professional duties caused Antonio's death and the deprivation of his constitutional rights.

273.    Defendants Saiz, Herrera, and Chavez-Buie further recklessly ignored and willfully bypassed established professional procedures and departed from accepted professional practices and standards when they manipulated the safety assessment tool by ignoring the actual facts of what had transpired in order to consider Barbara Gurule "safe" for Antonio and to proceed with the Trial Home Visit so that Defendants would not have to find another foster home for Antonio.

274.    Defendants Saiz, Herrera, and Chavez-Buie further recklessly ignored and willfully bypassed established professional procedures and departed from accepted professional practices and standards when they failed to address the serious concerns for Antonio's safety and welfare expressed by the service providers like TLR and La Vida Felicidad, and their failure to document their interactions and work on this case until after Antonio's death.

275.    The actions of Defendants Saiz, Herrera, and Chavez-Buie, as listed above, substantially departed from accepted professional practices or standards in such a way as to

abdicate reliance on professional judgment, and knowingly or recklessly subjected Antonio to danger that was known or obvious to these Defendants.

276.    Defendants Herrera and Chavez-Buie appear not only to have directly participated in this conduct, they also approved, ratified, authorized and otherwise facilitated the unconstitutional conduct of their subordinate, Defendant Saiz, for whom they had supervisory responsibility. Defendants Herrera and Chavez-Buie were deliberately indifferent in failing to supervise their subordinate's conduct.

277.    The conduct of Defendants Saiz, Herrera, and Chavez-Buie was knowing, unlawful, deliberate, indifferent, malicious, reckless, wanton and conscience-shocking.

278.    But for the actions and conduct of Defendants Saiz, Herrera, and Chavez-Buie described above, Antonio would not have been placed and allowed to continue to reside in the known dangerous environment of Barbara Gurule.

279.    But for the actions and conduct of Defendants Saiz, Herrera, and Chavez-Buie, as described above, Antonio would not have been in the home and at the mercy of a methamphetamine-addicted parent and the men with whom she surrounded herself, men addicted to methamphetamine and with serious criminal backgrounds.

280.    As a direct and proximate result of the acts of Defendants Saiz, Herrera, and Chavez-Buie as set forth above, Antonio suffered fatal physical injuries and also suffered pain, emotional distress, and severe mental anguish in connection with the deprivation of his constitutional rights.

## JURY TRIAL

281.    Plaintiff respectfully requests a six-person jury trial in the above entitled and numbered cause.

## PRAYER FOR DAMAGES

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants Saiz, Herrera, and Chavez-Buie for the following:

A.    Compensatory damages in an amount to be determined at trial;

B.    Punitive damages in an amount sufficient to punish Defendants for their intentional, reckless, and indifferent conduct and violation of Antonio's constitutional rights and to deter such violations in the future; and

C.    Reasonable attorneys' fees and costs of suit under 42 U.S.C. § 1988.

Respectfully Submitted,

*/s/ F. Michael Hart*
F. Michael Hart
Kelly Stout Sanchez
Julio C. Romero
Martinez, Hart, Thompson & Sanchez, PC
1801 Rio Grande Blvd. NW
Albuquerque, NM 87104
(505) 343-1776
mikeh@osolawfirm.com
kellys@osolawfirm.com
julior@osolawfirm.com

*and*

Margaret Strickland
McGraw & Strickland, LLC
165 West Lucero Ave.
Las Cruces, NM 88005
(575) 523-4321
margaret@lawfirmnm.com

*and*

Andrew G. Schultz
Rodey, Dickason, Sloan, Akin & Robb, P.A.
P.O. Box 1888
Albuquerque, NM 87103
(505) 765-5900
aschultz@rodey.com
**Attorneys for Plaintiff**

48