## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DENNIS MURPHY, as Personal
Representative of the Wrongful Death Estate
of ANTONIO GURULE JACOBS,

      Plaintiff,

v.                                    Civ. No. 21-822 MV/SCY

ESPERANZA SAIZ, in her individual capacity,
MICHELLE HERRERA, in her individual
capacity, and KIMBERLY CHAVEZ-BUIE, in
her individual capacity,

      Defendants.

### MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants' Motion to Dismiss [Doc. 19]. The Court, having considered the Motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion is not well-taken and will be denied.[1]

### BACKGROUND

The relevant facts as alleged in the Complaint are as follows. At the relevant times, Defendant Esperanza Saiz was the New Mexico Children, Youth and Families Department ("CYFD") case worker for Antonio and Barbara. *Id.* ¶¶ 6, 46. Defendant Michelle Herrera was Saiz's supervisor. *Id.* ¶¶ 7, 49. Defendant Kimberly Chavez-Buie was the County Office Manager for Valencia County, and had supervisory authority over Defendants Saiz and Herrera. *Id.* ¶¶ 8, 54.

Antonio was Barbara's seventh child, and CYFD removed all seven of her previous children from her care, or she relinquished her rights to them. *Id.* ¶¶ 33, 225. CYFD thus had

---

[1] With respect to Plaintiff's request for oral argument, the Court sees no reason for oral argument in this case and finds that oral argument would not assist the Court in its determination.

decades of information establishing Barbara's unfitness to care for, supervise, and protect her children because of her drug addiction. *Id.* ¶¶ 34-35, 225. On September 12, 2016, when Antonio was two months old, CYFD removed him from Barbara's home due to: Barbara's abuse and neglect history regarding her other children; the condition of the household; Barbara's methamphetamine addiction and history; Barbara's recent positive drug test; and Barbara's mental/physical illness. *Id.* ¶ 42. In August 2017, while Antonio was in foster care, Defendant Saiz learned about Jeffrey Moody, Barbara's boyfriend, when Barbara identified him as a person who was part of her support system and whom she would utilize in case of an emergency. *Id.* ¶ 71. Defendant Saiz knew that Moody had a criminal history and abused drugs, including methamphetamines. *Id.* ¶ 73.[2]

In November 2017, Defendants Saiz and Herrera decided to remove Antonio from foster care and place him with Barbara on a Trial Home Visit, a mechanism in which children in CYFD custody are placed into the home of their biological parent on a temporary basis that is closely monitored by CYFD. *Id.* ¶¶ 76-77. During Trial Home Visits, the child remains in CYFD's legal custody. *Id.* ¶ 78. Less than two months later, on January 24, 2018, Defendants Saiz and Herrera terminated the Trial Home Visit and placed Antonio back into a foster home. *Id.* ¶ 98. Defendants Saiz and Herrera made this decision after learning that Barbara was arrested on two outstanding warrants. *Id.* ¶ 98. During the first Trial Home Visit, Defendants Saiz and Herrera never confirmed whether Barbara was complying with the terms of her probation (including submitting to random drug tests), and they learned that she was leaving Antonio for

---

[2] In 2010, Moody was indicted for aggravated battery and child abuse. *Id.* ¶ 144. The complaint is silent as to whether Moody was convicted, and does not elaborate on Defendant Saiz's level of knowledge of the details of Moody's criminal history and whether it involved child abuse specifically.

inappropriate amounts of time with others and allowing unsafe persons into her home with Antonio. *Id.* ¶¶ 89-97.

After the Trial Home Visit terminated, on February 22, 2018, Barbara reported to Defendants Saiz and Herrera that she had used drugs while Antonio was in her home for the Trial Home Visit. *Id.* ¶ 105. Barbara also reported that she would not agree to do a drug test because she would be "dirty," i.e., test positive for drugs. *Id.* ¶ 106. On the same day, Defendants Saiz and Herrera discussed concerns about Barbara leaving Antonio with inappropriate caregivers. *Id.* ¶ 107. Defendants Saiz and Herrera also learned that other providers who were supposed to be in the home to help Barbara reported that Barbara was cancelling or not showing up for scheduled visits, was not responding via phone calls or text messages, had not installed child safety measures in her home, and had obtained a new roommate without informing CYFD. *Id.* ¶¶ 96a-e, 104a-f. Defendants Saiz and Herrera told Barbara that they would not do another Trial Home Visit until she underwent a neuropsychological evaluation with Dr. Sandra Montoya. *Id.* ¶ 113.

Two weeks later, Defendants Saiz and Herrera identified the following risk during a March 9, 2018 meeting: "Could mother safely protect Antonio should he be placed back in her home (especially with men in her life)?" *Id.* ¶¶ 115, 118 (emphasis and alterations removed). The following week, Defendant Saiz received Dr. Montoya's neuropsychological report. Dr. Montoya recommended that Barbara complete regular drug tests given her long-term methamphetamine addiction and recent relapse. *Id.* ¶¶ 123.

In sum, prior to and during a second Trial Home Visit, Defendants Saiz and Herrera knew the following information:

- They were not in compliance with CYFD policy that required a completed and approved Child Safety Assessment before a Trial Home Visit. *Id.* ¶¶ 129-30.

- Barbara had cancelled or "no-showed" for multiple home visits with Antonio through Time Limited Reunification Services ("TLR"), a program that assists parents in complying with their treatment plan and ensures the safety of children on a Trial Home Visit. *Id.* ¶ 96.

- TLR Services was a critical in-home service provider but was no longer was available and thus would not be able to provide any support for Barbara or Antonio. *Id.* ¶ 132.

- Barbara had missed visits with La Vida Felicidad, the service provider that was assigned to help Antonio meet developmental milestones. *Id.* ¶¶ 168-69, 184.

- Barbara had not undergone any drug tests and there was no confirmation that she was drug-free. *Id.* ¶ 134. In fact, Barbara had not shown up for a single court-imposed drug test. *Id.* ¶¶ 161, 187, 190, 197, 210.

- Barbara lied about completing drug tests and about why she could not do so. Barbara would tell Defendant Saiz that she did not have a phone or a vehicle to complete her drug tests, but then in the same conversation, Defendant Saiz would learn contradictory information, e.g. about how Barbara was able to call a social security office and friends, or Moody would advise Defendant Saiz that Barbara was at the store, doctor's office, or simply just left without stating where she was going. *Id.* ¶¶ 173, 188, 192-94.

- Defendant Saiz had not independently determined who was living in Barbara's home, relying only on her self-reports. *Id.* ¶ 135. But from her self-reports and one home visit, Defendant Saiz did know that Barbara was leaving Antonio with Moody, who had a history of drug abuse and criminal charges, who had smoked methamphetamines daily since 2010 and throughout the time that he was living in Barbara's home, and who was never evaluated as someone to care for Antonio. *Id.* ¶¶ 141, 145-46, 148, 167, 172-78, 209.

- Barbara lied to Defendant Saiz about whether she was leaving Antonio with anyone, specifically Moody. *Id.* ¶ 208-09.

- Barbara was failing to follow through on necessary medical treatment for Antonio, for example, failing to call 911 or see any medical provider when he suffered a seizure in her home in August 2018. *Id.* ¶¶ 180, 186, 201-02.

- Barbara had failed to register Antonio for school though this subject had been raised with her for the past two months. *Id.* ¶ 195.

- Barbara's home did not have a telephone and had a broken window with glass both outside and inside the home. *Id.* ¶¶ 199, 205.

Despite these significant concerns about Antonio's safety and well-being, on May 10,

2018, Defendants placed Antonio with Barbara for a second Trial Home Visit. *Id.* ¶¶ 126-27. The

results of the second Trial Home Visit were catastrophic. On September 3, 2018, Valencia County Sheriff's Department was dispatched to Barbara's home because Antonio was found unresponsive. *Id.* ¶ 214. Antonio was pronounced dead soon after. *Id.* The Office of the Medical Investigator found that Antonio died of multiple blows of significant force to his head from multiple directions. *Id.* ¶¶ 215-17. The death was ruled a homicide. *Id.* ¶ 218.

After Antonio was murdered, CYFD conducted an investigation into his death. *Id.* ¶¶ 219, 222-23. During the investigation, Barbara admitted that she was on methamphetamines and left Antonio in Moody's care at the time of Antonio's death; that Moody also used methamphetamines; that Moody had been living in her home for the past six to eight months; and that she would leave Antonio with Moody for long periods of time, including for up to three days. *Id.* ¶ 222. It also appeared that Antonio did not sleep in the same room as Barbara; instead, he shared a room on the other side of the house with Moody. *Id.* ¶ 220h. The investigation of the home revealed that it was unsanitary and unsafe: cockroaches were in the sink and on the walls; black bugs were on the kitchen floor and in the bathtub; the yard was filled with trash, including scrap metal and ripped garbage bags with their contents spilled out; all of the windows were blacked out with blankets or boards; and the home was illegally hooked up to electricity by way of an extension cord. *Id.* ¶¶ 220a-g. CYFD never documented any of these conditions in the home despite being present just days before. *Id.* ¶ 221.

## STANDARD

Because Defendants have filed an answer (Doc. 3), their "Motion to Dismiss" is instead a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. Doc. 19 at 2. The standard for evaluating a motion for judgment on the pleadings is the same as the standard for a motion to dismiss under Rule 12(b)(6). *Myers v. Koopman*, 738 F.3d 1190,

1193 (10th Cir. 2013). Rule 12(b)(6) permits a party to move to dismiss a claim for "failure to

state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function

on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at

trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for

which relief may be granted." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)

(quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).

 Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a "pleading that states

a claim for relief must contain . . . a short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It "does not require 'detailed factual

allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me-

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)).

 "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*,

550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Id.*

 In cases like this one, where Defendants move for dismissal on the basis of qualified

immunity, "[t]o 'nudge their claims across the line from conceivable to plausible,' ... plaintiffs

must allege facts sufficient to show (assuming they are true) that the defendants plausibly

violated their constitutional rights, and that those rights were clearly established at the time."

*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (citation omitted). After qualified immunity is asserted, the plaintiff must show (1) that the defendant's conduct violated a constitutional or statutory right, and (2) that the law governing the conduct was clearly established when the alleged violation occurred. *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998). For a law to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (internal quotation marks omitted). "[T]he clearly established law must be 'particularized' to the facts of the case." *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The degree of specificity required depends on the egregiousness of the challenged conduct; "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

## DISCUSSION

Defendants move for qualified immunity on the single count of the Complaint, which is entitled "Civil Rights Claim Against Defendants Saiz, Herrera, and Chavez-Buie – Special Relationship – Failure to Protect." Compl. at 36. The elements of a "special relationship" claim, arising under the Due Process Clause of the U.S. Constitution, are: (1) the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs; (2) the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger; (3) the defendant's conduct caused the plaintiff's injuries; and (4) the defendant's actions must shock the conscience. *Dahn v. Amedei*, 867 F.3d 1178, 1185-86

(10th Cir. 2017).

In their motion, Defendants do not dispute factors one and two. Instead, they contend that their actions were not the proximate cause of Moody's murder of Antonio because such murder was not foreseeable and that, for the same reason, their actions do not "shock the conscience." Doc. 19 at 5-12. Defendants also argue, on prong two of the qualified immunity test, that no case clearly established that Defendants' conduct was unlawful.

## I.    Constitutional Violation

### A.    Causation

Plaintiff's complaint plausibly pleads a constitutional violation under the "special relationship" doctrine. In arguing otherwise, Defendants contend that the complaint does not plead proximate causation, under which doctrine Defendants would have to have been aware of facts making it foreseeable that Antonio would suffer physical abuse in Barbara's home at Moody's hands. Doc. 19 at 6-7. They argue that the complaint alleges only that Defendants knew Moody had a criminal history and abused drugs, including methamphetamines, and knew that he was present at the home without Barbara on one occasion during the second Trial Home Visit. *Id.* They argue that these facts do not establish foreseeability, and that Moody's murder is a superseding cause that broke the chain of causation. *Id.* at 7-8.

Plaintiff argues that the proper test here is not proximate causation, but rather "but for" causation: but for Defendants' initial and continuing placement of Antonio in Barbara's home, knowing that she was not clean from methamphetamines and knowing that she permitted Moody to be alone with Antonio, who was also a drug user, Moody would not have murdered Antonio while Barbara was high on methamphetamines. Doc. 24 at 20-21.[3]

---

[3] In Plaintiff's response, the native pagination differs from the pagination in the CM ECF header. The Court's references are to the CM ECF header pagination.

Both parties cite causation language from cases arising under 42 U.S.C. § 1983 outside the context of special-relationship case law. The Court instead will look to what the Tenth Circuit has said about the causation standard for special-relationship claims arising under the Due Process Clause.[4] These cases "require an 'affirmative link' between the state actor's conduct and 'the injuries suffered' to impose special relationship liability." *Hunt v. Montano*, 39 F.4th 1270, 1281 (10th Cir. 2022) (alterations omitted) (quoting *Yvonne L. ex rel. Lewis v. N.M. Dep't of Hum. Servs.*, 959 F.2d 883, 890 (10th Cir. 1992)). "That calls for something more than mere but-for causation or coincidence." *Id.*

*Hunt* involves facts strikingly similar to the case at bar. Five CYFD employees were sued regarding the abuse of two foster children, T.B. and F.B., and the death of a third foster child, Ariza Barreras. *Id.* at 1274. Initially, two CYFD employees placed the three children in the care of foster parents Dominguez and Romero. *Id.* at 1275. Dominguez and Romero relied heavily on respite care, contacting CYFD to arrange placements with a nearby respite care provider, Stephanie Crownover. *Id.* The baby, Ariza Barreras, died while in Crownover's care.

Because Crownover did not have a bed for the baby, she strapped Barreras into a car seat on the floor to put her to sleep. *Id.* at 1277. As a result, on one December morning Crownover discovered Barreras slumped forward in the car seat with her left arm caught in the shoulder strap. She was not breathing. The Office of the Medical Investigator pronounced her dead. *Id.* A law enforcement investigation revealed that the outside temperature had fallen below freezing overnight, there were holes in the walls and ceiling, and the heater was not operational. *Id.* The floors were filthy, rotten food was found in the refrigerator and around the house, trash was

---

[4] *See Hunt v. Montano*, 39 F.4th 1270, 1281 (10th Cir. 2022) ("The [parties]' arguments about whether the general causation standard for § 1983 liability is satisfied, while important to the merits, are irrelevant to whether qualified immunity was properly denied based on a constitutional violation under the special relationship doctrine.").

stuffed under the beds, soiled clothing and diapers were stacked in the corners, dog feces and urine covered the floor, and human feces floated in the toilet. *Id.* Officers described the odor in the house as "intolerable." *Id.* They described the other children, T.B. and F.B., as sick, soiled, and unbathed, with severe diaper rashes. *Id.*

The Tenth Circuit held that the complaint stated a claim against the two CYFD employees who were involved in licensing and monitoring Crownover. *Id.* at 1279-80. The two employees, Montano and Griffin, "allegedly knew about Crownover's precarious financial situation, her alcohol and drug problems, her criminal history, her previous relationships with abusers, and her record of committing physical abuse herself—including a battery against her six-year-old granddaughter. Montano and Griffin had personal knowledge that Crownover's home lacked necessary beds and bedding." *Id.* at 1280. "Montano had personal knowledge of complaints related to Crownover's ability to care for foster children but declined to investigate them or monitor her. Other foster parents reported to Montano that Crownover failed to provide adequate hygienic care and in one instance ignored a child's hand, foot, and mouth disease. Notes allegedly taken by Montano and Griffin mention an 'incident' with Crownover that 'was against policy' and 'unacceptable,' but did not lead to any response." *Id.*

The Tenth Circuit found the causation element of a special relationship claim was satisfied:

> There is an obvious "affirmative link" between the licensing and monitoring of Crownover and the injuries suffered by the children in her care. The children's representatives allege a host of risk factors ignored by Montano and Griffin in licensing Crownover, all of which were exacerbated by their failure to adequately monitor her. When the children were placed in her care, these risks became real. Barreras died while sleeping in a car seat; Montano and Griffin allegedly knew Crownover did not have a bed and never followed up. T.B. and F.B. suffered physical harm in Crownover's home; Montano and Griffin allegedly knew that Crownover was an abuser who fraternized with abusers. The children were

10

harmed in Crownover's care, tragically but foreseeably, because of Crownover's conduct as a respite care provider.

*Id.* at 1281 (citation omitted).

In the course of its analysis, *Montano* relied on two prior published cases, which the Court will examine in turn. First came *Schwartz v. Booker*, in which three Colorado county departments of human services were called upon, over a period of almost three years, to investigate allegations and signs of physical abuse of Chandler Grafner, who died while in foster care. 702 F.3d 573, 576 (10th Cir. 2012). Over these three years, the defendants received reports from the child's mother, teachers, and social workers regarding safety concerns about Jon Phillips (the foster parent), signs of non-accidental physical injuries, and interviews during which Chandler revealed that he experienced retaliation from Phillips because of the investigations. *Id.* 576-78. Despite repeated reports raising concerns about Chandler's safety, the defendants simply transferred or closed each of the referrals without taking any steps to remedy the situation. *Id.* "On May 6, over three weeks after the [most recent case closure], Chandler was found in a locked closet in an emaciated state and taken from Jon Phillips's home; Chandler died later that day from cardiac arrest caused by severe dehydration and starvation." *Id.* at 578. With respect to causation, the Tenth Circuit said: "[P]laintiffs have sufficiently pled a causal connection between the alleged abdication of duty and Chandler's injuries: Had [the defendants] timely investigated the April referral they would have discovered Chandler's declining health caused by his continued starvation and dehydration." *Id.* at 586.

Second, *Montano* cited the case of *Matthews v. Bergdorf*, in which the Tenth Circuit addressed a special relationship claim based on physical injuries to M.S., a child in a state-assigned "guardianship" at the home of Jerry and Deidre Matthews. 889 F.3d 1136, 1142, 1148. During this guardianship, the Oklahoma Department of Human Services ("ODHS") "received

11

Referral 990680, the first of many over the next several years regarding the increasingly dire situation at the Matthews' residence." *Id.* at 1148.

> On June 29, 2005, referral 990680 was made to ODHS concerning neglect in the form of inadequate or dangerous shelter and inadequate physical care. The reporter alleged that the home was dirty, the children were bathed once a week to save money on water, the children had no socks in the winter, the laundry was dirty, the yard was dangerous, and a preteen boy and girl were sharing a bedroom. The referral was screened out and no one at ODHS took any action to protect Rachel Matthews, G.M. or M.S. The referral was handled by Kila Bergdorf and D. Johnston.

*Id.* (original alterations omitted). The Tenth Circuit found that the causation element was satisfied with respect to M.S.'s claim against Kila Bergdorf based on the following quote from the complaint: "Plaintiffs suffered actual physical injury and mental pain and suffering as a direct result of ODHS employees failing to properly investigate referrals of neglect and abuse of Plaintiffs, and failing to protect Plaintiffs from the Matthews' neglect and abuse." *Id.* at 1149 (original alterations omitted))

Based on this binding precedent, the Court must side with Plaintiff here: Defendants knew of the unsafe and unsanitary state of the home and numerous factors related to Barbara's unfitness to be a parent, including her very serious drug abuse problems.[5] They placed Antonio with her anyway, and then failed to properly monitor whether Barabara was abusing drugs and whether she was delegating childcare to unsafe persons. Antonio was murdered while in Barbara's care because of Barbara's active drug use and delegation of care to an unsafe person,

---

[5] In a footnote, Defendants argue that "the Complaint does not contain any allegation that either Defendant Herrera or Defendant Chavez-Buie had any knowledge at all regarding Moody," and so the claims against these defendants must be dismissed. Doc. 19 at 6 n.1. But the Court's analysis does not turn on Defendants' specific knowledge of Moody. The Court focuses on their knowledge of *Barbara* as an unfit caretaker, including knowledge as a general matter that she was delegating Antonio's care to unsafe persons. To the extent that Defendants intended to raise any other flaws in Plaintiff's complaint against Defendants Herrera and Chavez-Buie, the Court declines to address them for failure to sufficiently develop any such argument.

circumstances which were foreseeable to Defendants based on the facts allegedly known to them. *Cf. Hunt*, 39 F.4th at 1281 ("The children were harmed in Crownover's care, tragically but foreseeably, because of Crownover's conduct as a respite care provider.").

Further, the Court is persuaded by Plaintiff's argument that, on a motion to dismiss at the initial stages of a case, Plaintiff's burden is not overly cumbersome. Doc. 24 at 23 n.5; *see Matthews*, 889 F.3d at 1149 ("What the rules of notice pleading call for is a complaint alleging enough facts to raise a reasonable expectation that discovery will reveal evidence that a constitutional violation has in fact occurred.") (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In other words, Plaintiff need show only that it is plausible that there is an "affirmative link" between Antonio's injuries and Defendants' actions in placing Antonio with a methamphetamine user with a history of child neglect. At this stage, Defendants do not dispute that part of the relevant causal chain involves Barbara using methamphetamines and neglecting Antonio by leaving him in someone else's care while she was using—a situation plainly foreseeable to Defendants based on the information they knew. This is sufficient to establish a plausible "affirmative link" at the pleading stage.

B.    Conscience-shocking

Defendants argue that knowingly placing a child with a drug user who has a history of neglect is at worst negligent, but not conscience-shocking. Doc. 19 at 11-12. Defendants stress, again, that there were no signs of physical abuse in Barbara's history or her home and that they had no reason to anticipate that Moody would murder Antonio. *Id.* at 12. At the pleading stage and drawing all inferences in Plaintiffs' favor, the Court disagrees with Defendants' analysis.

"Conduct is shocking to the conscience when the degree of outrageousness and magnitude of potential or actual harm is truly conscience shocking." *Schwartz*, 702 F.3d at 586 (internal quotation marks and alterations omitted). "Conscience-shocking behavior evades

precise definition and evolves over time. We must consider three guiding principles when evaluating a substantive due process claim: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Id.* (internal quotation marks and alterations omitted). The standard "requires more than mere negligence." *Id.* at 585.

In *Armijo ex rel. Chavez v. Wagon Mound Public Schools*, a special education student at a public school was suspended and driven home without parental notification, and subsequently committed suicide. 159 F.3d 1253 (10th Cir. 1998).[6] The Tenth Circuit held that a jury could find the defendants' behavior shocked the conscience because:

- Schutz' and Herrera's conduct put Armijo at substantial risk of serious, immediate and proximate harm by suspending him from school, which caused him to become distraught and to threaten violence, and then taking him to his home and leaving him alone with access to firearms;

- They had some knowledge that might support an inference that Armijo was suicidal and distraught, was unable to care for himself, was home alone, and at least some of the Individual Defendants knew Armijo had access to firearms;

- By taking this action, knowing of Armijo's vulnerability and risks of being left alone at home, Schutz and Herrera acted recklessly in conscious disregard of the risk of suicide; and

- Such conduct, if true, when viewed in total, possibly could be construed as conscience-shocking, depending on context as determined after a full trial.

*Id.* at 1264.

And in *Matthews*, the Court found that the claims against one social worker, Bergdorf, relating to the child, M.S., satisfied this standard:

---

[6] *Armijo* discussed the "shocks the conscience" standard in the context of a danger-creation theory under substantive due process, rather than the special-relationship theory at issue in this case. However, the Tenth Circuit has quoted and relied on *Armijo*'s discussion of "shocks the conscience" in special-relationship cases. *Schwartz*, 702 F.3d at 586-87.

The question remaining is whether M.S. has alleged facts *related to the referral* that tend to shock the conscience. Paragraph 39 alleges caseworker Bergdorf "screened out" a referral that alleged the Matthews' foster home was dangerous and filthy, M.S. did not bathe frequently, his or her clothes were dirty, and preteen children of different sexes were sleeping in the same room. We believe these allegations, while perhaps not conscience shocking on their face, render it plausible that Bergdorf failed to exercise professional judgment regarding a conscience-shocking situation at the Matthews' residence, a situation that grew progressively worse over time.

*Matthews*, 889 F.3d at 1149.

Finally, *Hunt* described the following as sufficient to state a claim under the conscious-

shocking element:

Accepting the allegations in the complaint as true, Montano and Griffin licensed Crownover—and Montano circumvented CYFD protocols to permit Barreras, T.B., and F.B. to be repeatedly placed in her care—despite her history of crime, past dangerous relationships, financial situation, alcohol and drug problems, and record of physical abuse against a child in her care. They knew Crownover's home lacked necessary beds and bedding but never followed up to make sure she purchased some before providing care. They allowed Crownover to care for the children even as CYFD investigated reports of abuse by Crownover against T.B. and F.B. The notes hastily entered after Barreras's death suggest a shocking degree of malfeasance when compared with the condition of the home in December 2017.

39 F.4th at 1282.

Plaintiffs argue that similar reasoning applies here: prior to Antonio's death, Defendants

knew the following information: they were placing a child with a methamphetamine user who

admitted to using while her child was in her care and who refused to take drug tests; Barabara

had lied to them about her drug behavior and who was caring for Antonio; Barbara lacked

professional third-party support systems; Barbara had been unfit to care for any of her children in

the past because of abuse and neglect cases; the conditions of her home were filthy, bug-infested,

and strewn with trash (and they failed to document those conditions until after Antonio's death);

and Barbara was allowing her child to be alone with other people, without investigating whether

such persons were safe caretakers. Finally, given the horrific manner in which Moody murdered

Antonio while Barbara was on methamphetamines, the "magnitude of . . . actual harm is truly conscience shocking." *Cf. Schwartz*, 702 F.3d at 586 (internal quotation marks and alterations omitted). The Court finds that, at this stage of the case and drawing all inferences in Plaintiff's favor, "such conduct, if true, when viewed in total, possibly could be construed as conscience-shocking, depending on context as determined after a full trial." *Armijo*, 159 F.3d at 1264.

Defendants' argument to the contrary relies on an unpublished case from the Tenth Circuit, *Hubbard v. Oklahoma ex rel. Okla. Dep't of Human Servs.*, 759 F. App'x 693 (10th Cir. 2018). Because this case is unpublished, it is "not precedential, but may be cited for [its] persuasive value." 10th Cir. R. 32.1(A). The Court finds it unpersuasive as applied to this case.

At first glance, the facts of *Hubbard* appear similar to the present case and the line of cases described above—state social workers neglecting to remedy conditions relating to child abuse and neglect, ultimately resulting in the death of a child, A.P. In *Hubbard*, the defendants first learned of unsafe conditions for three children (an older brother, a middle sister, and A.P.) in the home of their biological parents. 759 F. App'x at 696. Police removed the children from the home, a court adjudicated the children to be deprived, and the children were placed in foster care. *Id.* The biological parents continued to maintain an unsafe home, and trial reunification was unsuccessful. *Id.* at 697.

While in foster care, however, things did not improve for the children. The foster parents reported that the oldest child was sexually assaulting the middle child. The ODHS arranged therapy for the two older children, but the foster parents failed to take the children to therapy regularly. ODHS continued to receive numerous referrals alleging that the children continued to act out sexually. One defendant detected the odor of marijuana in the home. In interviews, the oldest child disclosed spanking by the foster parents, and the middle child disclosed sexual abuse

16

by her older brother. ODHS also received a report that the foster mother had scalded and injured A.P. by placing him in a hot bath, and that she blamed these injuries on the oldest child. ODHS did not open a referral incident based on this report. *Id.* at 697-98.

A few months after the scalding incident, Defendants learned that A.P. was in the hospital. He had sustained a C-1 vertebral fracture and an occipital skull fracture, which resulted in his death. *Id.* at 698. The foster mother was charged in state court with felony child abuse murder. Following A.P.'s death, the two other children were removed from the foster home. *Id.*

The Tenth Circuit found that no "special relationship" existed while the children were in the custody of their biological parents. *Id.* at 709. Thus, the focus of the analysis was on whether the defendants' behavior was conscience-shocking during the period of foster care placement. Although the Tenth Circuit analyzed the allegations against each individual defendant separately, the analysis ultimately relied on the same findings and conclusions:

- Defendants were making regular home visits;

- Defendants arranged for therapy sessions in light of the sexual abuse allegations, and the children attended some sessions but defendants failed to take steps with the foster parents to arrange for better therapy attendance;

- Defendants did not have any knowledge of physical abuse other than reports of spanking;

- With respect to the allegations of sexual assault perpetuated by one of the children, defendants were planning for that child's eventual removal from the foster home; and

- One defendant witnessed evidence of marijuana use in the home.

*Id.* at 710-13. The Tenth Circuit concluded that the allegations stated claims of negligence, rather than conscience-shocking behavior, and that any delay in addressing problems in the home relating to the oldest child's sexual abuse did not "cause" the sexual abuse or A.P.'s death. *Id.*

*Hubbard* is distinguishable from the instant case, as the allegations in *Hubbard* do not rise to the same level of seriousness as do the allegations in this case. For one thing,

methamphetamine use is a much more serious drug addiction than one instance of marijuana use. *Cf.* Compl. ¶¶ 16-32. For another, in *Hubbard*, the abuse allegations focused primarily on the behavior of a child in the home relating to sexual assault, rather than the failings of the foster parents as caretakers (with minimal allegations relating only to lack of regular therapy visits, spanking, and the odor of marijuana). *Hubbard* repeatedly emphasized that there was no evidence that the Defendants knew the foster parents themselves neglected or abused the children. *Id.* at 710-13.[7] In the present case, by contrast, Defendants' knowledge pertained to a parent's own history of child abuse and neglect, and indications that she was allowing unsafe persons into her home with Antonio. Therefore, the Court finds *Hubbard* to be unpersuasive as applied to Plaintiffs' allegations in this case. The Court rejects Defendants' arguments and finds that the complaint states a plausible claim for violation of Antonio's constitutional rights.

## II.    Clearly Established Law

The finding that the complaint states a claim is only the first half of the analysis. To survive the motion to dismiss, Plaintiff must also show that Defendants' actions were contrary to clearly established law. As the discussion above highlights, the Tenth Circuit has already answered this question.

In *Matthews*, the Tenth Circuit held that both prongs of qualified immunity were satisfied based on the allegations that caseworker Bergdorf "screened out" a referral concerning neglect in the form of inadequate or dangerous shelter and inadequate physical care. The reporter alleged that the home was dirty, the children were bathed once a week to save money on water, the children had no socks in the winter, the laundry was dirty, the yard was dangerous, and a preteen

---

[7] The analysis section of this opinion does not make any reference to the report of the foster mother placing A.P. in a scalding hot bath and blaming another child for the injuries, which took place a few months before A.P.'s death. *Cf. Hubbard*, 759 F. App'x at 698. For this additional reason, the Court finds the analysis less persuasive.

boy and girl were sharing a bedroom." 889 F.3d at 1148. The Tenth Circuit found causation with respect to M.S.'s subsequent "physical injury and mental pain and suffering." *Id.* at 1149. The Tenth Circuit then held that "in 2005 the law was well established such that a reasonable caseworker cognizant of the governing law would have understood Bergdorf's failure to protect M.S. in light of child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception." *Id.* at 1149-50 (citing *Yvonne L.* and *Schwartz*).[8]

> Defendants resist this conclusion, arguing:

> Defendants are not aware of any case law in the Tenth Circuit or any jurisdiction holding that a government actor may be held liable for the unforeseeable actions of a third person in murdering a child that was in the legal custody of the state during a trial home visit with the biological mother, particularly in the absence of prior physical abuse or other circumstances which would place the government on notice of the risk of the asserted harm. As discussed above, the Tenth Circuit held just the opposite in *Hubbard*.

Doc. 19 at 14.

The Court has rejected the initial premise of this argument: that child abuse was unforeseeable based on the decision to place a child with a known drug user who had an extensive history of child neglect and who delegated care to unsafe persons. Further, *Matthews* is contrary to the remainder of this argument: that "prior physical abuse" is a necessary element of such a claim. There were no allegations or suspicions of physical abuse raised in the referral discussed in *Matthews*, but the Tenth Circuit held that the complaint stated a claim based on resulting physical injuries anyway.

It is true that *Hubbard*—issued a few months after *Matthews* was published—held that in the absence of facts showing that the government workers "knew of physical abuse or abdicated

---

[8] *Matthews* was decided on May 8, 2018, two days prior to the start of the Second Trial Home Placement. But because it held that the law was "clearly established" as of 2005, its analysis applies to all of the conduct alleged in the complaint in the present case.

[their] professional duty with respect to the risk of physical abuse," the defendants' conduct did not have a causal link to the resulting physical abuse or shock the conscience. 759 F. App'x at 711-13. As discussed above, the Court finds this opinion distinguishable on several grounds and unpersuasive with respect to whether a constitutional violation occurred in the case at bar. In addition, an unpublished case that states a rule contradictory to a prior published case cannot undermine already clearly established law.

The facts of Antonio's placement in Barbara's home in this case are frankly much more egregious than the allegations in the referral ignored in *Matthews* (inadequate or dangerous shelter and inadequate physical care) as well as the allegations against the foster parents in *Hubbard* (missed therapy sessions, spanking, and the odor of marijuana). Drawing all inferences in favor of the Plaintiff, the Court finds that the complaint plausibly alleges conduct that, if true, any reasonable official would have known violated Antonio's right to a safe placement.

## CONCLUSION

For the foregoing reasons, the Court finds that the complaint states a plausible claim for violation of Antonio's constitutional rights, and that the complaint plausibly alleges conduct that, if true, any reasonable official would have known violated Antonio's right to a safe placement.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss [Doc. 19] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Opposed Motion for Oral Argument on Defendants' Motion to Dismiss [Doc. 32] is **DENIED**.

DATED this 23rd day of December 2024.

_____
MARTHA VÁZQUEZ
Senior United States District Judge